AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

ONE DIGITAL DEVICE AND
ONE VEHICLE LOCATED IN
WASHINGTON, D.C. UNDER RULE 41

)
)
)
)
)
)

Case No. 25-sw-287

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2, hereby incorporated by reference.

located in the _____Jurisdiction of the_____ District of _____Columbia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2, hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846, | Unlawful Distribution and Possession With Intent to Distribute Controlled Substances and |
| 18 U.S.C. § 924(c), | Conspiracy thereof, Using, Carrying and Possessing a Firearm During and In Relation to a Drug |
| 18 U.S.C. § 922(g)(1) | Trafficking Offense, Unlawful Possession of a Firearm and Ammunition by a Prohibited Person |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant, which is incorporated herein.

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher Hyder, Investigator
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:     _____09/25/2025_____

_____
*Judge's signature*

City and state:   _____Washington, D.C._____        Matthew J. Sharbaugh, United States Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❏ Original    ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be search*<br>*or identify the person by name and address)*<br><br>ONE DIGITAL DEVICE AND<br>ONE VEHICLE LOCATED IN<br>WASHINGTON, D.C. UNDER RULE 41 | )<br>)<br>)   Case No.  25-sw-287<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:    Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Jurisdiction of the_____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2, hereby incorporated by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2, hereby incorporated by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____October 9, 2025_____ *(not to exceed 14 days)*
❏ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Matthew J. Sharbaugh_____ .
*(United States Magistrate Judge)*

❏ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❏ for _____ days *(not to exceed 30)*    ❏ until, the facts justifying, the later specific date of _____ .

Date and time issued:    _____09/25/2025_____    _____
*Judge's signature*

City and state:    _____Washington, D.C._____    Matthew J. Sharbaugh, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br> 25-sw-287 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A-1

*Property to be searched*

### TARGET DEVICE

The property to be searched is a blue Samsung cell phone, with sticker bearing IMEI 351449343831560 and IMEI 351742593831565, which is currently stored by the Metropolitan Police Department's Digital Evidence Unit, located at 401 E Street SW, Washington, DC.

## <u>ATTACHMENT A-2</u>

*Property to be searched*

### TARGET VEHICLE

The property to be searched is a gray Mercedes sedan bearing Maryland tag number 7GT4806 and/or VIN: WDDLJ9BB8EA113831, which is currently stored by the Metropolitan Police Department at 2850 New York Avenue, NE, Washington, D.C.

# ATTACHMENT B-1

*Property to be seized from the TARGET DEVICE*

1.        The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: Unlawful Distribution and Possession With Intent to Distribute Controlled Substances and Conspiracy thereof, in violation of 21 U.S.C. §§ 841 and 846; Using, Carrying and Possessing a Firearm During and In Relation to a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c); and Unlawful Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (hereinafter, the "**TARGET OFFENSES**"), involving DARYLE DRIVER, and co-conspirators (collectively, the "SUBJECTS") as described in the search warrant affidavit, including, but not limited to call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data that contain, constitute evidence of, document, establish, identify, or reflect:

   a.  Records and information relating to, or evidencing commission of, the **TARGET OFFENSES**;

   b.  Records and information identifying locations where the individual committed the **TARGET OFFENSES**, traveled to before and after the commission of the **TARGET OFFENSES**, and in preparation for the **TARGET OFFENSES**;

   c.  Records and information reflecting the ownership and use of the items identified in Attachments A1-A2 by the individual committing the **TARGET OFFENSES**;

1

d.  Records and information documenting meetings and communications between individuals committing one or more of the **TARGET OFFENSES**;

e.  Records and information reflecting communications between the individual committing one or more of the **TARGET OFFENSES** and other individuals, discussing the commission of one or more of the **TARGET OFFENSES**;

f.  Records and information relating to the possession and/or sale of narcotics;

g.  Records and information relating to the location where narcotics are being stored;

h.  Records and information relating to property used in connection with commission of the **TARGET OFFENSES**;

i.  Records and information relating to communications between individuals concerning one or more of the **TARGET OFFENSES**;

j.  Records and information relating to proceeds obtained from the commission of the **TARGET OFFENSES** or the means used to purchase narcotics;

k.  Records and information related to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact concerning the **TARGET OFFENSES**;

l.  Records and information related to the email addresses, phone numbers, social media account identifiers used by perpetrators, aiders and abettors, coconspirators, and accessories after the fact concerning the **TARGET OFFENSES**;

m. Records and information that constitute evidence of the states of mind of DARYLE DRIVER and others with whom he is involved in trafficking drugs or committing

2

associated crimes (e.g., acts of violence), e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the **TARGET OFFENSES**;

n. Records and information that constitute evidence concerning persons who either: (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the **TARGET OFFENSES**; or (ii) communicated with DARYLE DRIVER relating to the **TARGET OFFENSES**, including records that help reveal their whereabouts;

o. Records and information about individual(s) or group(s) that may be having disputes with DARYLE DRIVER and those with whom he is engaged in the **TARGET OFFENSES**;

p. Evidence of who used, owned, or controlled the TARGET DEVICE at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

q. Evidence of software, or the lack thereof, that would allow others to control the TARGET DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3

r.  Evidence of the attachment to the TARGET DEVICE of other storage devices or similar containers for electronic evidence;

s.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the TARGET DEVICE;

t.  Evidence of the times the TARGET DEVICE was used;

u.  Passwords, encryption keys, and other access devices that may be necessary to access the TARGET DEVICE.

v.  Documentation and manuals that may be necessary to access the TARGET DEVICE or to conduct a forensic examination of the TARGET DEVICE;

w.  Records of or information about Internet Protocol addresses used by the TARGET DEVICE; and

x.  Records of or information about the TARGET DEVICE's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4

## ATTACHMENT B-2

*Property to be seized from the TARGET VEHICLE*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of: Unlawful Distribution and Possession With Intent to Distribute Controlled Substances and Conspiracy thereof, in violation of 21 U.S.C. §§ 841 and 846; Using, Carrying and Possessing a Firearm During and In Relation to a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c); Unlawful Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (hereinafter referred to as the "**TARGET OFFENSES**"), involving DARYLE DRIVER, and co-conspirators (collectively, the "SUBJECTS") described in the search warrant affidavit, including, but not limited to:

a. Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, and packaging of illegal narcotics substances, including, but not limited to, scales, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, and other items that are evidence of the **TARGET OFFENSES**.

b. Weapons, including but not limited to revolvers, semi-automatic pistols, rifles, ammunition, magazines, bulletproof vests, and firearms-related paraphernalia including, but not limited to, gun-cleaning kits, gun-sights, holsters, receipts and documentation for the purchase of same, and related firearm paraphernalia, which constitute tools for the commission of the **TARGET OFFENSES**.

5

c. Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the **TARGET OFFENSES**, proceeds of the **TARGET OFFENSES**, and contain evidence of the **TARGET OFFENSES**.

d. Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the **TARGET OFFENSES**.

e. Clothing worn by the SUBJECTS and their associates during or in relation to the **TARGET OFFENSES**.

f. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, narcotics suppliers, conspirators, and potential witnesses of violations of the **TARGET OFFENSES**.

g. Books, records, receipts, bank statements, money drafts, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the **TARGET OFFENSES**.

6

h. United States currency, precious metals, jewelry and financial instruments, including but not limited to, stocks and bonds, documents and papers evidencing ownership, possession, storage, and location of such assets and facilities to safely store and secure such items, such as safes and lock or strong boxes.

i. Photographs, in particular photographs of co-conspirators, assets, firearms, and controlled substances, which constitute evidence of the **TARGET OFFENSES**.

j. Evidence of relationships between DRIVER and any co-conspirators, including evidence of identification and evidence of motivation to engage in narcotics trafficking and/or the unlawful possession of firearms.

k. Cellular telephones and indica of ownership (such as boxes, manuals, cases, and chargers), computers, laptops, tablets, DVDs and other storage media, hard drives, and electronic storage devices, and receipts reflecting their ownership and use, which contain records of the commission of the **TARGET OFFENSES**, proceeds, or other evidence thereof;

l. Safes, both combination and key type, and their contents, which can contain evidence of the commission of the **TARGET OFFENSES** or proceeds from the commission of the **TARGET OFFENSES**.

m. Indicia of ownership, occupancy, or control of the target locations and vehicles, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity as to individuals committing the **TARGET OFFENSES**; and

n. Financial records and articles of personal property evidencing or containing the evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of money and assets

derived from or to be used in the sale of controlled substances, including books, receipts, records, bank statements and records, business records, money drafts, money orders, wire transfer receipts, and cashier's check receipts, passbooks, bank checks, safes, records of safety deposit boxes and storage lockers that would constitute evidence of the **TARGET OFFENSES**.

2.     Digital devices used in the commission of, or to facilitate, the commission of the **TARGET OFFENSES**.

3.     For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

a. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.   evidence of the times the Device(s) was used;

f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.   records of or information about Internet Protocol addresses used by the Device(s);

i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.   Routers, modems, and network equipment used to connect computers to the Internet.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF
ONE DIGITAL DEVICE AND ONE
VEHICLE LOCATED IN WASHINGTON,
D.C. UNDER RULE 41

SW No. 25-sw-287

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher Hyder, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a search warrant authorizing the examination of the following property:

(1) a blue Samsung cell phone with a sticker bearing IMEI 351449343831560 and IMEI

351742593831565 (hereinafter, the "TARGET DEVICE"); and (2) a gray Mercedes sedan bearing

Maryland tag number 7GT4806 and/or VIN: WDDLJ9BB8EA113831 (hereinafter, the "TARGET

VEHICLE"), as described in Attachments A1-A2, which are currently in the possession of the

Metropolitan Police Department in Washington, D.C.  Such a search would include an examination

of the seized devices for information described in Attachments B-1 and B-2.

1.      I am "an investigative or law enforcement officer" of the United States within the

meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated

in Section 2516 of Title 18, United States Code. I am a sworn Police Officer with the Metropolitan

Police Department ("MPD") and have been since 2013.  I am currently assigned to the Violent

Crime Suppression Division ("VCSD") Violent Crime Impact Team ("VCIT").  My work has

focused on narcotics- and gun-related investigations and has involved the execution of search warrants wherein narcotics and weapons have been seized.  As an Investigator with the VCIT, I am responsible for investigations involving unlawful activities that include firearm offenses, drug offenses, and violent crimes.

2.      During the course of my work as an officer investigating narcotics- and firearms-related offenses, I have participated in the search of premises, vehicles, and individuals, which has led to the recovery of contraband and evidence, including narcotics, firearms, and digital devices. In addition, I regularly work with confidential informants who provide information about individuals involved in drug trafficking and have become familiar with the ways that drugs are sold on the streets of Washington, D.C.  In speaking with confidential informants, I have learned how cell phones and other digital devices are regularly used to arrange and coordinate the sale of drugs (including coordinating with suppliers and purchasers of the product).  Because cell phones contain digital records of these relationships and communications, including text messages, photographs, call records, and internet search histories, digital devices can contain a great deal of information regarding a drug trafficker's business.

3.      As an MPD officer, I have prepared and obtained search warrants related to digital devices and accounts related to social media.  I have also assisted in the review of electronic communications and materials received pursuant to judicially authorized search warrants for digital devices and social media accounts.  Through my experience and training in these investigations, I am aware that individuals who engage in narcotics trafficking and related firearms offenses frequently use digital devices and social media to communicate and exchange images related to their illicit conduct.  As a result of these investigations, I have become familiar with the

11

manner and methods in which narcotics traffickers utilize such tools to assist them in their narcotics trafficking.

4.      In addition, based on my training, experience, and participation in firearms and narcotics investigations, and the training and experience of other law enforcement officers and agents with whom I am working on this investigation, I know that:

(a)      Persons who engage in narcotics trafficking usually keep narcotics, narcotics-related items and paraphernalia, money, firearms, and firearm-related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds, and storage lockers.  Persons who illegally possess firearms and/or narcotics traffickers that utilize stash houses oftentimes still have contraband or evidence of those crimes within their residences. In addition, in an enterprise involved in the distribution and possession with intent to distribute fentanyl, marijuana, crack cocaine, powder cocaine, or heroin, these locations may also contain apparently innocuous materials that are used for specific purposes in the drug trade.  For example, small and large plastic baggies are the packaging material of choice for many narcotics traffickers; scales are often used to ensure the quantities are commensurate with price, as well as to determine as accurately as possible the varying amounts of the drugs being sold; microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are often used to "cook" powder cocaine into crack cocaine, or to mix and dilute heroin, and transport it discreetly thereafter.

(b)      It is also common for narcotics traffickers to distribute from specific locations other than their own residences, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and other locations where trusted associates of

the trafficker are allowed access, in order to protect the cache of drugs, as well as, the drug proceeds derived from the sale of these drugs.  Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs.

(c)     Narcotics traffickers often use and retain firearms and other weapons to protect themselves as well as to secure their cache of narcotics.  Individuals who possess and store firearms in their residences, vehicles and/or stash locations, or in the residences of trusted associates, often also store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits, and ownership papers.

(d)     Narcotics traffickers may also keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase.  These records may be in written or electronic form.  Narcotics traffickers also often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, numerous business cards, photographs, address and telephone number books and papers, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances, and contact information for associates and co-conspirators in the narcotics trade.  This documentary evidence may include credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.  These items are generally maintained and retained for long periods of time in the drug traffickers' residences or the residences of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is

13

associated.  It also is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, personal digital assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to iPods and external storage drives; and the media to store information, including diskettes, tapes, or data storage devices.

(e)     Individuals involved in narcotics trafficking often conceal within their residences, the residences of family members, friends and associates, the places of operation of the drug distribution activity such as, stash houses or safe houses, or in business locations with which the traffickers are associated, large amounts of currency, financial instruments, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard and more importantly, conceal such proceeds of their drug trafficking.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of: Unlawful Distribution and Possession With Intent to Distribute Controlled Substances and Conspiracy thereof, in violation of 21 U.S.C. §§ 841 and

14

846; Using, Carrying and Possessing a Firearm During and In Relation to a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c); and Unlawful Possession of a Firearm and Ammunition by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1) (hereinafter, the "**TARGET OFFENSES**") have been committed by DARYLE DRIVER and that evidence of this will be contained within the TARGET DEVICE and TARGET VEHICLE, as set forth below. There is therefore probable cause to search the information described in Attachments A-1 and A-2 for evidence of the TARGET OFFENSES, as described in Attachments B-1 and B-2.

## PROBABLE CAUSE

*July 26, 2025 Shooting*

7.    On July 26, 2025, at approximately 10:19 p.m., members of MPD's Real Time Crime Center ("RTCC") advised that ShotSpotter detected sounds of gunshots in the vicinity of 114 Wilmington Place SE, Washington, D.C.  Simultaneously, Complainant-l ("C-1") called 911 to report that an individual, later identified as Daryle DRIVER, had shot at C-1 and Complainant-2 ("C-2") at their apartment building, located at 108 Wilmington Place SE.  Both C-l and C-2 were interviewed by law enforcement and reported, in sum and substance, seeing DRIVER standing on the other side of the apartment building's front glass door.  After DRIVER pointed and fired a rifle style firearm and fired in their direction, C-1 and C-2 ran back inside their apartment and DRIVER went to the back of their apartment building and fired additional shots into their apartment, causing damage to their window and wall, and into the air.  Law enforcement recovered multiple spent .223 caliber shell casings around the apartment building located at 108 Wilmington Place SE, whose front glass door had been shattered by gunfire.

8.     C-1 reported having seen DRIVER one other time with an acquaintance ("W-1"), who was not present at the time of the shooting, and recognized him as the father of W-1 's children, who goes by the nickname 'TuTu.' C-1 reported learning that DRIVER was angry and looking for W-1 over the loss of a "brick" and that s/he believed DRIVER came to C-1 's home looking for W-1. Your affiant is aware the term "brick" can commonly refer to a quantity of narcotics, typically a larger quantity in a pressed powder form, causing the narcotics to take the shape of a brick.

9.     Law enforcement contacted W-1, who identified Tutu as Daryle DRIVER, with a DOB of 12/30/1984 and address of 6104 Longfellow Street, Riverdale, Maryland. Law enforcement database queries also identified Daryle DRIVER, with a DOB of 12/30/1984 and an address of 6104 Longfellow, Riverdale, Maryland. In addition, a Maryland driver's license issued to DRIVER on August 4, 2025, has the same address listed. During a follow-up interview with C-1 on August 19, 2025, law enforcement showed C-l nine simultaneous photographs in a 'photo array' with DRIVER's picture displayed over number three. C-1 viewed the array and immediately identified DRIVER as the individual who shot at C-1 with 100% confidence.

10.     Based on the above, on September 9, 2025, Honorable D.C. Superior Court Judge Zoe Bush signed an arrest warrant for DRIVER for Assault with a Dangerous Weapon (Warrant No. 2025CRWSLD003916). As further discussed below, during the September 11, 2025 arrest of DRIVER on the outstanding warrant, law enforcement recovered suspected narcotics from his person and seized the TARGET DEVICE and TARGET VEHICLE. As also discussed below, that same day, law enforcement executed a residential search warrant on DRIVER's residence in Riverdale, Maryland, which resulted in the seizure of additional quantities of suspected narcotics, four firearms and ammunition, and approximately $13,000 in U.S. currency.

16

*Arrest of Driver and Seizure of the TARGET DEVICE and TARGET VEHICLE*

11.     On September 11, 2025, law enforcement observed DRIVER operating the TARGET VEHICLE, a gray Mercedes sedan registered to DRIVER and bearing Maryland tag number 7GT4806.  After DRIVER parked the vehicle in front of 785 Barnaby Street SE, Washington, D.C. and exited, he was arrested pursuant to the pending D.C. Superior Court arrest warrant (No. 2025CRWSLD003916).  During a search incident to his arrest, officers located a white rock like substance cocaine base (which field-tested positive for cocaine base and weighed approximately 4.0 grams with packaging) wrapped in paper inside DRIVER's left sock. Law enforcement additionally located two plastic twists (which field-tested positive for mannitol and weighed approximately 7.51 grams combined with packaging).  It is known that mannitol is a common cutting agent for manufacturing narcotics.  During the search, officers also located three measuring spoons on a keychain on Defendant Driver's person.  Each spoon had white residue on it.

12.     Inside of the TARGET VEHICLE, where DRIVER was seen exiting, law enforcement also observed in plain view a digital scale with white residue in the driver's side door pocket, as well as the TARGET DEVICE, which was located on the driver's seat of the vehicle. To ensure the preservation of any evidentiary value, the TARGET DEVICE was seized and turned over to the MPD's Digital Evidence Unit and the TARGET VEHICLE was towed to MPD's Violent Crime Suppression Division.

*Execution of Search Warrant at Driver's Residence*

17

13.     On September 11, 2025, the Honorable Judge Judge Ajmel Quereshi of the United States District Court for the District of Maryland also authorized the search of DRIVER's residence, located at 6104 Longfellow St, Riverdale, Maryland (Case no. 8:25-mj-02340).  That same day, the Federal Bureau of Investigation ("FBI"), assisted by MPD, executed the warrant at the residence, which was unoccupied during the execution of the search warrant.  As detailed below, items recovered during the execution of the search warrant provided additional evidence as to DRIVER's involvement with narcotics trafficking, as well as the unlawful possession of firearms.

14.     During the execution of the search warrant, law enforcement located the following in a bedroom:

- Approximately 374.2 grams of white substance with packaging, which field-tested positive for cocaine;

- $13,425 in U.S. Currency;

- a black Smith & Wesson M&P rifle, bearing serial number TM63268, with a drum style magazine attached, which was loaded with ammunition at the time of the recovery;[1]

- a black AR style pistol with no serial number, with a magazine attached, which was located on top of a second loaded rifle magazine; and

---

[1] A WALES/NCIC query revealed that this firearm had been reported stolen from Weldon County, North Carolina.

- Mail matter in the name of DRIVER.

15.    In the kitchen, law enforcement located an additional approximately 131.8 grams of a white substance including packaging, some of which field-tested positive for cocaine base and some of which field tested positive for amphetamines.  In another bedroom, believed to be attributed to DRIVER's son, Damairee Bond, based on mail matter, law enforcement recovered two additional handguns and additional narcotics.

16.    Further records check revealed that DRIVER has previously been convicted of a crime punishable by imprisonment for a term exceeding one year.  For example, in D.C. Superior Court Case Number 2005 FEL 007144, he was convicted of Bail Reform Act (felony) and, on January 24, 2006, sentenced to 12 months, fully suspended, with 6 months of probation. On September 12, 2006, his probation was revoked and DRIVER was sentenced to 12 months incarceration.  Additionally, records checks indicate that in Prince George's County Circuit Court (Maryland) Case Number CTl40163X, he pled guilty to manufacturing/distributing/possession with intent to distribute a controlled substance and, on August 15, 2024, he was sentenced to 10 years of imprisonment (3,110 days suspended).

## THE TARGET DEVICE

17.    I have experience investigating the statutes underpinning probable cause.  Based on my training, experience, and participation in narcotics investigations, and the training and experience of other law enforcement agents with whom I am working on this investigation, I know that:

(a)     It is common for individuals engaged in the unlawful trafficking/possession of narcotics to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of such trafficking, and other efforts of co-conspirators.  It is also common for those individuals to utilize social media, such as Instagram, to further their criminal activities;

(b)     Individuals engaging in the unlawful trafficking/possession of narcotics use cellular telephones, cellular telephone technology, and social media (e.g., Instagram) to communicate and remain in contact with suppliers, customers, or possessors of those narcotics;

(c)     Individuals who engage in the unlawful trafficking/possession of narcotics use cellular telephones and social media (e.g., Instagram) to exchange information with customers and/or sources of supply through text messaging and direct messaging in addition to telephone conversations.   It is also common for narcotics traffickers/possessors to send photographs and videos as an exchange of information with customers and/or source(s) of supply;

(d)     Cellular telephones and social media accounts used by narcotics traffickers/possessors contain valuable information and evidence relating to their activities. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, direct messages, images and video, Global Positioning System data, and any other stored electronic data. This information can: (i) reflect the preparation for, arrangement of, and commission of

20

the trafficking; (ii) identify locations where traffickers traveled to before and after transporting or selling contraband; (iii) reflect the ownership and use of the cellular telephones and narcotics by the traffickers; (iv) document meetings and communications between traffickers, their customers, associates, and co-conspirators; (v) reflect communications between traffickers and other individuals, discussing the trafficking and possession of narcotics; (vi) reflect communications between traffickers and other individuals who may have assisted or provided support in the trafficking or possession of the narcotics; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the trafficking; (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of contraband; and (ix) may include information about individuals or groups with whom the trafficker(s) have a dispute;  and

(e)     Individuals involved in the unlawful trafficking/possession of narcotics often use cellphone cameras to take video recordings and photographs of themselves or other members of the organization engaging in illegal activities, such as the distribution of narcotics. Those photographs and videos are often posted on social media accounts such as Instagram, YouTube, or other platforms via uploading data to applications installed on the cellular device.

18.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices. In a fact sheet from November 13, 2024, The Pew Research Center for Internet & Technology estimated that 98% of Americans owned at least one cellular phone, and that that same

2024 report estimated that 91% of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Dec. 26, 2024).

19.     Your affiant knows that cellular phones, like the TARGET DEVICE, are relevant. This includes the following facts related to digital devices, like the TARGET DEVICE:

20.     Your affiant knows that cellular telephones contain valuable information and evidence relating to the **TARGET OFFENSES**.  Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data.  This information can: (i) reflect the preparation for, arrangement of, and commission of the **TARGET OFFENSES**; (ii) identify locations relevant to the **TARGET OFFENSES**; (iii) reflect the ownership and use of the cellular telephones by persons involved in the commission of the **TARGET OFFENSES**; (iv) document meetings and communications between associates, and co-conspirators of the **TARGET OFFENSES**; (v) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the **TARGET OFFENSES**; and (viii) document or contain evidence of the purchase of items or the assets derived from the **TARGET OFFENSES**.

21.     In summation, the execution of a search warrant on the TARGET DEVICE would allow law enforcement to, among other things, obtain records and information relating to the TARGET OFFENSES.

**TECHNICAL TERMS**

22.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such

as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.     "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired

or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

      f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

      g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line

("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

        j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

        k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

        l.     "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example

usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

      m.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

      n.    "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

            i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

        ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

        o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

        p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

23.      Based on my training, experience, and research, I know that the TARGET DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and personal device assistance. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offense(s) under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

24.      As described above and in Attachment B-1, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the TARGET DEVICE, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the TARGET DEVICE for at least the following reasons:

a.     Individuals who engage in criminal activity, including possession with the intent to distribute controlled substances and narcotics trafficking,  use digital devices, like the Device, to communicate with co-conspirators about their activities and to maintain documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators, email correspondence, text or other "Short Message Service" ("SMS") messages, contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts, as well as records of their illegal transactions and activities. In this case, law enforcement has observed targets of the investigation regularly using digital devices, including cellular phones, to communicate with one another and with narcotics customers.

b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

25.     As further described in Attachment B-1, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the TARGET DEVICE at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the TARGET DEVICE, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created

33

and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.     I know that when an individual uses a digital device to further drug trafficking activity, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

26.     Based on my knowledge, training, and experience, as well as information relayed to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices –

35

may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or

software requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is

concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide Photos Video -Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and has offered the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and

misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

i. Law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, transport the TARGET DEVICE to an appropriate law enforcement laboratory or similar facility for review. The digital devices, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B-1.

ii. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for

deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

iii.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B-1.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B-1.  Any search techniques or protocols used in searching the contents of the TARGET DEVICE will be specifically chosen to identify the specific items to be seized under this warrant.

27.   On September 11, 2025, the TARGET DEVICE in question was seized by law enforcement. The TARGET DEVICE, which appears to be Samsung that was powered on and possibly unlocked by the user (also known as an After First Unlock state).  Your affiant has learned that some phones will reboot themselves after a period of inactivity.  The result of this reboot, in practical terms, means that the overwhelming majority of the device's data will be inaccessible to law enforcement unless the combination of the phone model and the operating system it's running is later supported for brute-forcing the possible passcode combinations.  There is no guarantee that this will occur.  Additionally, there is no guarantee that even with the tools available to brute-force the passcode, that the tool will be able to do so.  As such, your affiant submitted the device to

MPD's Digital Evidence Unit, and DEU personnel conducted an intrusion into the phone for the sole purpose of disabling this timer (should one have been present) and by doing so, preserving the state the phone was recovered in and the data that was contained within at the time of recovery as well. The actual contents of the phone have not been accessed or viewed during this process.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

28.     Because forensic examiners will be conducting their search of the digital devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

### CONCLUSION

29.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that the TARGET DEVICE and TARGET VEHICLE contain evidence of the **TARGET OFFENSES**.

30.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.

31.     I further request that the Court permit the search warrant to be executed at any time, given that the TARGET DEVICE and TARGET VEHICLE are contained on the premises of MPD.


Respectfully submitted,

_____
Christopher Hyder
Investigator
Metropolitan Police Department

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 25, 2025.


_____
HONORABLE MATTHEW J. SHARBAUGH
UNITED STATES MAGISTRATE JUDGE